UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RLI INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CORNERSTONE LAND AND INVESTMENT GROUP, INC.,<br><br>Defendant. | No. 2:23-cv-02265-DAD-CSK<br><br>ORDER GRANTING DEFENDANT'S MOTION TO STAY AND GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE A COUNTERCLAIM<br><br>(Doc. Nos. 20, 21) |

This matter is before the court on the motions to stay this entire action and for leave to file a counterclaim brought on behalf of defendant Cornerstone Land and Investment Group, Inc. ("Cornerstone") on April 15, 2024. (Doc. Nos. 20, 21.) The pending motions were taken under submission on the papers pursuant to Local Rule 230(g). (Doc. No. 24.) For the reasons explained below, the court will grant both defendant's motion to stay and motion for leave to file a counterclaim.

**BACKGROUND**

On April 14, 2022, Garry and Gillian Mahrt, residents of Sonoma, California, filed a negligence lawsuit in the Sonoma County Superior Court against multiple defendants, including Cornerstone (the "underlying action"). (Doc. No. 1-4.) In their complaint filed in that state court action, the Mahrts seek over $2.6 million in damages arising from an incident that occurred while

1

1   Cornerstone was representing them as the buyers of a property in Dixon, California known as the
2   McKenzie Ranch. (Doc. No. 1-4 at ¶¶ 2–3.) "Threat actors" posing as Cornerstone and
3   Cornerstone's agent Gabriel Foster allegedly sent the Mahrts various correspondence including
4   wiring instructions to transmit substantial sums of money for the purchase of the McKenzie
5   Ranch. (Doc. No. 1 at ¶ 5.) On or about August 16, 2021, the requested sums were allegedly
6   wired to the threat actors and were thereby lost. (*Id*.)

7   On October 5, 2023, Cornerstone's insurance provider RLI Insurance Company ("RLI")
8   filed the complaint initiating this federal court action, naming Cornerstone as the defendant, and
9   seeking rescission of the Target Professionals – Miscellaneous Professional Liability insurance
10  policy in effect from September 17, 2021 to 2022 (the "Policy"), or in the alternative, declaratory
11  relief. (Doc. No. 1.) In its complaint in this action, RLI alleges the following:

12  On August 17, 2021, one day after the Mahrts allegedly wired money to the threat actors
13  posing as Cornerstone's agent, Cornerstone signed and submitted a renewal insurance application
14  (the "Application") to RLI.[1] (*Id*. at ¶ 6.) Cornerstone answered "no" in response to Question 9 of
15  the Application which stated: "After inquiry, do any partners, members, directors, or officers of
16  the firm for which coverage is sought, have knowledge of any incident, a circumstance, an event,
17  or unresolved fee dispute that may result in a claim?" (*Id*.) Cornerstone also answered "no" in
18  response to Question 10 of the Application which stated: "Within the past five (5) years, have
19  you had any information security breaches, including unauthorized access, unauthorized use,
20  unauthorized disclosure, virus, denial of service attack, theft of data, fraud, electronic vandalism,
21  sabotage, extortion or other security events, including notification for any actual or potential
22  compromise of information." (*Id*. at ¶ 7.)

23  The Application was signed by Cornerstone president Joshua Cook. (*Id*. at ¶ 8.) Just
24  above the signature line, the Application stated:

25  > "I declare that I am the authorized agent for the firm for the purposes
    > of procuring insurance and have answered this application on behalf
26  > of the firm and its members. **As the authorized agent, I declare**

---

[1] As will be made clear below, it is Cornerstone's position that it did not learn of the Mahrts' loss until three days after it had submitted the Application to RLI.

2

> **that if the firm or any of its members become aware of any information that would change answers furnished in the application, the firm will reveal such information in writing to the Company prior to the effective date of coverage.** On behalf of the applicant firm, I declare that this application, including attachments, supplementary pages and other exhibits attached, is complete and correct.  I understand that the application shall form the basis of the contract of insurance should the Company offer coverage and should the firm accept the Company's quotation.  I also understand that completion of this application does not bind the Company or broker to provide insurance."

(*Id*.) (emphasis added).  Cornerstone learned of its client's loss no later than August 20, 2021, and on or about August 23, 2021 Cornerstone contacted its insurance broker and informed it of the facts concerning the loss of the Mahrts' wired funds.  (*Id*. at ¶¶ 10, 11.)  Cornerstone and its broker did not notify RLI of the incident at this time nor did they supplement Cornerstone's answers to Questions 9 and 10 as required by the Application.  (*Id*. at ¶ 11.)

On September 17, 2021, in reliance on the Application submitted to it, RLI issued the Policy with the limits of liability at $1,000,000 per claim and $1,000,000 aggregate.  (*Id*. at ¶ 12.)

On March 15, 2022, Cornerstone sent an email to RLI first notifying RLI of the Mahrts' alleged loss and advising it of a potential claim under the Policy.  (*Id*. at ¶ 17.)  RLI undertook prompt investigation and requested further documentation.  (*Id*.)  On April 29, 2022, RLI issued a letter to Cornerstone responding to the March 15, 2022 notice, advising Cornerstone that if a claim were to arise from this event, coverage would likely be precluded "because Cornerstone concealed and/or misrepresented material information prior to the issuance of the RLI Policy." (Doc. No. 1-3 at 4.)  The letter also advised Cornerstone of potentially applicable exclusions under the Policy, particularly, the exclusion of any claim arising out of a Network Security

/////
/////
/////
/////
/////
/////
/////

Breach[2], a Privacy Breach[3], or Social Engineering[4]. (*Id*. at 5.) That same day, RLI received from Cornerstone a copy of the lawsuit that the Mahrts filed against Cornerstone and other defendants

---

[2] According to the Policy, "Network Security Breach" means "the failure by any person or organization, including but not limited to the Insured or a service provider of the Insured, to prevent unauthorized access to, unauthorized use of, a denial of service attack directed against, or transmission of malicious code to or from, the Insured's Computer System." (Doc. No. 1-3 at 7.)

[3] According to the Policy, "Privacy Breach" means:

> a. the failure by any person or organization, including but not limited to the Insured or a service provider of the Insured, to prevent the access to or theft, disclosure, or misappropriation of any person's or organization's confidential or personal information, including but not limited to patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or
>
> b. the violation of:
>
>> (i) the Insured's privacy policy;
>>
>> (ii) the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder, as amended;
>>
>> (iii) the Gramm-Leach-Bliley Act of 1999 (GLBA) and the rules and regulations promulgated thereunder, as amended;
>>
>> (iv) any consumer protection or unfair and deceptive trade practice law enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C § 45 (a), as amended;
>>
>> (v) any security breach notification law that requires notice to individuals or organizations of the actual or potential theft of personal, private, or confidential information, including but not limited to the California Security Breach Notification Act of 2003 (CA SB1386), as amended; or
>>
>> (vi) any other state, federal or foreign statute or regulation requiring reasonable security for personal, private, or confidential information, or a privacy policy limiting the sale, disclosure or sharing of personal information or providing individuals with the right to access or correct personal information.

(Doc. No. 1-3 at 7.)

[4] According to the Policy, "Social Engineering" means "the Insured's reliance upon a deceptive misrepresentation, which the Insured believes to be genuine." (Doc. No. 1-3 at 8.)

1 in the Sonoma County Superior Court.  (Doc. No. 1 at ¶ 20.)  On May 12, 2022, RLI issued a
2 supplementary coverage letter to Cornerstone advising that RLI has no duty to defend or
3 indemnify Cornerstone with respect to this matter.  (*Id*. at ¶ 22.)  The letter stated that coverage
4 was precluded under the Policy "because Cornerstone concealed and/or misrepresented material
5 information" in its Application, and RLI also again advised that coverage may be independently
6 precluded under the Network Security Breach, Privacy Breach, and/or Social Engineering
7 exclusions.  (Doc. No. 1-5 at 4–5.)  RLI believes that Cornerstone disputes the bases for RLI's
8 declination of insurance coverage.  (Doc. No. 1 at ¶ 24.)

9 Based on these allegations in its complaint, plaintiff RLI asserts the following two causes
10 of action:  (1) a rescission claim to rescind the Policy in its entirety; and, in the alternative, (2) a
11 declaratory relief claim regarding its duty to defend or indemnify Cornerstone.  (*Id*. at 6–8.)

12 On April 15, 2024, defendant Cornerstone filed the pending motions requesting the court
13 stay this entire action pending resolution of the underlying state court action and to grant
14 Cornerstone leave to file a counterclaim.  (Doc. Nos. 20, 21.)  On May 13, 2024, RLI filed an
15 opposition to Cornerstone's motion to stay and a notice of non-opposition to Cornerstone's
16 motion for leave to file a counterclaim.  (Doc. Nos. 27, 28.)  On May 22, 2024, Cornerstone filed
17 a reply in support of its motion to stay.  (Doc. No. 29.)

18 **LEGAL STANDARD**

19 "[T]he power to stay proceedings is incidental to the power inherent in every court to
20 control the disposition of the causes on its docket with economy of time and effort for itself, for
21 counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *accord Stone v. INS*,
22 514 U.S. 386, 411 (1995) (Breyer, J., dissenting) ("[W]e have long recognized that courts have
23 inherent power to stay proceedings and 'to control the disposition of the causes on its docket with
24 economy of time and effort for itself, for counsel, and for litigants.'") (quoting *Landis*, 299 U.S.
25 at 254); *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 842 (9th Cir. 2023).  Deciding whether to
26 grant a stay pending the outcome of other proceedings "calls for the exercise of judgment, which
27 must weigh competing interests and maintain an even balance."  *Landis*, 299 U.S. at 254–55.  The
28 party seeking such a stay must "make out a clear case of hardship or inequity in being required to

5

1  go forward, if there is even a fair possibility that the stay for which he prays will work damage to
2  some one [sic] else." *Id.* at 255.

3  In considering whether to grant a stay, this court must weigh several factors, including
4  "[1] the possible damage which may result from the granting of a stay, [2] the hardship or
5  inequity which a party may suffer in being required to go forward, and [3] the orderly course of
6  justice measured in terms of the simplifying or complicating of issues, proof, and questions of law
7  which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir.
8  1962) (citing *Landis*, 299 U.S. at 254–55); *see also Ernest Bock, LLC*, 76 F.4th at 842.  A stay
9  may be granted regardless of whether the separate proceedings are "judicial, administrative, or
10 arbitral in character, and does not require that the issues in such proceedings are necessarily
11 controlling of the action before the court." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857,
12 864 (9th Cir. 1979).

**ANALYSIS**

**A.   Defendant's Motion to Stay**

15  In its pending motion, defendant urges the court to "exercise its discretion to stay the
16  entire action, or bifurcate RLI's claims and stay the claim for declaratory relief pending resolution
17  of the Underlying Action." (Doc. No. 20-1 at 2.)  Defendant argues that there are "factual issues
18  to be litigated in this coverage action which overlap and are inextricably intertwined with issues
19  to be resolved in the Underlying Action," so that "proceeding with this case would prejudice
20  Cornerstone." (*Id.*)  Defendant specifically moves to stay under *Montrose Chemical Corp. v.*
21  *Superior Court*, in which the California Supreme Court stated that "a stay of the declaratory relief
22  action pending resolution of the third party suit is appropriate when the coverage question turns
23  on facts to be litigated in the underlying action."  6 Cal. 4th 287, 301 (1993).

24  As alluded to above, the court finds that the applicable standard in assessing the pending
25  motion to stay in this case is the *Landis* standard, not the standard under California law as stated
26  in the *Montrose* decision.  This court has diversity jurisdiction over the claims in this action
27  pursuant to 28 U.S.C. § 1332. (Doc. No. 1 at ¶ 1.)  Federal courts sitting in diversity apply
28  federal procedural law and state substantive law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64

6

(1938). "Because a stay of an action is procedural, not substantive, the [c]ourt applies [f]ederal law to determine whether to grant a stay." *United Specialty Ins. Co. v. Bani Auto Grp., Inc.*, No. 18-cv-01649-BLF, 2018 WL 5291992, at *4 (N.D. Cal. Oct. 23, 2018). This is true where, as here, the proceeding in state court may narrow but not fully resolve all claims. *Sanchez v. Green Messengers, Inc.*, 666 F. Supp. 3d 1047, 1051 (N.D. Cal. 2023). Accordingly, the court will determine whether to impose a stay of this action pursuant to *Landis* by weighing the following competing interests: (1) whether there is a fair possibility that a stay will cause damage; (2) whether a party may suffer hardship or any inequity if a stay is not imposed; and (3) whether a stay will contribute to the orderly course of justice. *See CMAX, Inc.*, 300 F.2d at 268.

        1.     <u>Fair Possibility that a Stay will Cause Damage</u>

If there is even a fair possibility that a stay will work so as to cause damage to someone other than the movant, then a stay may be inappropriate absent a showing of hardship or inequity to the movant. *Landis*, 299 U.S. at 255. In its opposition to the pending motion to stay, RLI argues that it "would be prejudiced by a stay in delaying its right to a prompt determination of its Rescission and related Declaratory Judgment claims, providing critical guidance for determining its rights or obligations with respect to a pending demand by Cornerstone for coverage." (Doc. No. 27 at 17.) In reply, defendant argues that "RLI faces no prejudice from a stay, as it has refused to defend Cornerstone in the underlying action and so is simply facing a delay in the determination of whether it made the right decision." (Doc. No. 29 at 5.) RLI has not responded to this contention or sought leave to clarify this point; the court therefore assumes that Cornerstone's representation is accurate.

Certainly, RLI has an undeniable right to bring this action and seek determination of its rights and responsibilities. *See Aetna Cas. & Sur. Co. v. Merritt*, 974 F.2d 1196, 1199 (9th Cir. 1992) ("We know of no authority for the proposition that an insurer is barred from invoking diversity jurisdiction to bring a declaratory judgment action against an insured on an issue of coverage."). However, because RLI is not defending Cornerstone in the underlying action, RLI is not bearing potential risks that a stay might enhance, such as the risk of the insured's potential insolvency and inability to repay defense costs. Finding no compelling reason why a stay in this

7

case would cause damage to RLI beyond the mere delay of a coverage determination, the court concludes that this factor weighs neutrally. *See Amguard Ins. Co. v. Optima Funeral Home, Inc.*, No. 22-cv-04179-MWF-JC, 2022 WL 18142556, at *6 (C.D. Cal. Nov. 29, 2022) ("[T]he fact that AmGuard has not established harm over-and-above delay . . . renders this factor neutral.").[5]

### 2. Hardship or Inequity if a Stay is not Imposed

Courts analyze the competing interest of hardship and inequity "if there is a fair possibility that a stay will cause damage to a party opposing the stay." *Integon Preferred Ins. Co. v. Camacho*, No. 1:16-cv-01496-AWI-SAB, 2018 WL 6620342, at *11 (E.D. Cal. Dec. 18, 2018) (citing *Landis*, 299 U.S. at 255). Here, the court has already found that RLI has not demonstrated that there is a fair possibility that the granting of a stay of this federal action will cause it damage, so the court need not consider this competing interest. Nonetheless, the court will briefly address this factor. *See Integon Preferred Ins. Co.*, 2018 WL 6620342, at *11–12 (addressing this competing interest despite concluding that it "does not come into play").

Defendant Cornerstone argues that without a stay, it "will be forced to wage a two-front war in defending itself in the underlying action and this action." (Doc. No. 29 at 5.) The court finds this argument "unavailing because being required to defend oneself in an independent proceeding does not consist of a hardship or inequity under *Landis*." *Integon Preferred Ins. Co.*, 2018 WL 6620342, at *11 (citing *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005)). Although the court need not take this factor into consideration, it remains the case that defendant Cornerstone has not shown that it would suffer hardship or inequity without a stay.

### 3. Orderly Course of Justice

The third competing interest is whether imposing a stay will contribute to the orderly course of justice. *CMAX, Inc.*, 300 F.2d at 268. A stay contributes to the orderly course of justice if it will simplify the issues, evidence, or questions of law before the federal court. *Id.* This can

---

[5] The court notes that the district court in *Amguard* went further still, observing that "[m]ost courts have rejected the argument that an insurer would be damaged by a stay that requires the insurer to continue to defend an insured before an ultimate coverage determination is made." 2022 WL 18142556, at *5 (citing cases); *see also Ohio Casualty Insurance Company v. California-Pacific Annual Conference of United Methodist Church*, No. 2:23-cv-02850-SB-MAR, 2023 WL 9004987, at *5 (C.D. Cal. Nov. 17, 2023).

8

1    occur, for example, when the related proceeding will help develop comprehensive evidence that
2    bears on the questions at issue in the federal lawsuit. *Id*. at 269. This remains true even when the
3    federal court is not bound by the findings and conclusions drawn from the related proceeding, so
4    long as the related proceeding provides valuable assistance to the resolution of the federal lawsuit.
5    *Lockyer*, 398 F.3d at 1111.

6    Defendant Cornerstone argues that a stay of this case would contribute to the orderly
7    course of justice because the "coverage issues raised by RLI overlap with factual issues to be
8    litigated" in the underlying state court action. (Doc. No. 20-1 at 8.) In particular, Cornerstone
9    notes that the coverage letter that RLI attached to its complaint in this action referred to the
10   Privacy and Network Security Exclusions and the Social Engineering Exclusion as possible bases
11   for RLI's contention that it has no duty to defend or indemnify Cornerstone as to a claim arising
12   out of the events at issue in the underlying state court action. (*Id*. at 9.) Cornerstone argues that
13   the applicability of those exclusions "will turn on factual determinations made in the Underlying
14   Action concerning *how* the alleged perpetrators of the wire fraud against the Mahrts accomplished
15   their goals." (*Id*.) Cornerstone admits, however, that such factual overlap is only applicable as to
16   RLI's declaratory relief claim and that there is "no factual overlap" between the underlying state
17   court action and RLI's claim in this case for rescission, which is based solely on Cornerstone's
18   alleged concealment, misrepresentation, and/or failure to disclose material facts in the
19   Application. (*Id*. at 10.) Accordingly, defendant Cornerstone argues that should the court choose
20   not to stay the entire action, the court should at the very least bifurcate and stay RLI's declaratory
21   judgment claim while the rescission claim is litigated. (*Id*.)

22   In its opposition, RLI argues that a stay will not contribute to the orderly course of justice,
23   because resolution of the underlying action will not "decide or meaningfully limit the major
24   issues in dispute in the present action concerning nondisclosure in the insurance process." (Doc.
25   No. 27 at 17–18.) RLI does not meaningfully address Cornerstone's argument that the underlying
26   state court action may involve factual overlap with this action to the extent that RLI's declaratory
27   judgment claim is not solely predicated on the alleged nondisclosure by Cornerstone, but is also
28   predicated on the Policy exclusions noted above. However, RLI does propose that if the court is

inclined to grant a partial stay, the court should instead bifurcate and stay "all issues other than misrepresentation/concealment in the insurance application" while proceeding on both its rescission and declaratory judgment claims as predicated on misrepresentation/concealment. (Doc. No. 27 at 19.)  Defendant Cornerstone opposes this approach in its reply, arguing that "[a]ny declaration of the parties' rights and obligations under the Policy should be made at the same time," rather than through bifurcation of issues within the claims presented by RLI in this case.  (Doc. No. 29 at 6.)

      The court finds that while the factual issues raised as a result of RLI's rescission claim do not overlap with the underlying action, Policy provisions at issue in RLI's declaratory judgment claim do in fact involve such overlapping facts and evidence.  In particular, disposition of the Mahrts' negligence claims in the underlying state court action will likely put at issue the mechanics of the threat actors' operation (a matter which remains unaddressed and currently unclear to this court)[6], and thus may involve development of comprehensive evidence bearing on whether Cornerstone fell victim to social engineering or experienced a network security or privacy breach.  In this court's view, a determination of what actually occurred when the threat actors communicated with the Mahrts would be highly relevant in determining whether the Policy exclusions that RLI has identified in fact apply.  Such a determination would likely clarify whether Cornerstone relied upon any deceptive misrepresentations by the threat actors and whether Cornerstone's computer system or their confidential or personal information was the subject of an unauthorized accessing, which are key factual inquiries in determining the applicability of the Network Security Breach, Privacy Breach, and Social Engineering Policy exceptions.  *See State Nat'l Ins. Co., Inc. v. US-SINO Inv., Inc.*, No. 5:13-cv-05240-EJD, 2015 WL 5590842, at *4 (N.D. Cal. Sept. 23, 2015) (finding, in an insurance coverage dispute regarding a death at a construction site, that a determination as to the "causation of the accident

---

[6] RLI notes in their coverage determination letter that the Mahrts emailed Cornerstone on August 20, 2021 with the message that "You, me and/or the escrow company were probably hacked." (Doc. No. 1-5 at 3.)  In their first amended complaint filed in the underlying state court action, the Mahrts allege that the threat actors "hacked into computers located in the state of California," without providing more specificity about which entity or party was the owner of the computers that were hacked.  (Doc. No. 20-2 at ¶ 29.)

and the insured's conduct" would be relevant to determining whether the policy exclusion for subsidence, which applies when an injury arises solely from earth movement such as landslides and mudflow, was applicable); *Scottsdale Ins. Co. v. Bottoms Up Bar & Ents., Inc*, No. 21-cv-02078-DOC-KES, 2022 WL 2203667, at *3 (C.D. Cal. Apr. 8, 2022) (finding that factual issues in the underlying state court suit involving allegations that a pedestrian was killed by an intoxicated driver would overlap with the applicability of the "Liquor Exclusion" in the defendant bar's liability insurance policy, which applied if the bar caused "the intoxication of any person"); *Nationwide Ins. Co. of Am. v. Skalsky*, No. 2:23-cv-01772-DAD-CSK, 2024 WL 3226669, at *6 (E.D. Cal. June 28, 2024) (finding that a determination as to the mechanics of what occurred when the defendant's dog escaped the defendant's car and attacked a woman would be relevant to determining whether "the vehicle was still in the process of being unloaded" for purposes of coverage under the defendant's auto insurance policy).

      Accordingly, a stay of RLI's declaratory judgment claim is appropriate to avoid overlapping or conflicting determinations and to permit the state court to develop the factual record as to the mechanics of the Mahrts' loss, especially given that neither of the other two factors considered by the court weigh against imposing a stay. *See US-SINO Inv., Inc*., 2015 WL 5590842, at *4–5 (N.D. Cal. Sept. 23, 2015) (granting a stay where the coverage determination would require the court to delve into "issues and factual determinations overlap[ping] with the state civil proceedings," including "facts surrounding the circumstances of the decedent's accident"); *Colony Ins. Co. v. Temescal Rei, LLC*, No. 1:19-cv-01778-NONE-JLT, 2021 WL 535414, at *6 (E.D. Cal. Feb. 12, 2021) (granting a motion to stay where the underlying state court action would "include the making of factual determinations upon which coverage may hinge"); *Atain Specialty Ins. Co. v. Zenisco, Inc*., No. 19-cv-05198-HSG, 2020 WL 3640011, at *4 (N.D. Cal. July 6, 2020) (staying the plaintiff's declaratory judgment claim where some of its bases for declining coverage under the relevant policy implicated claims brought in the underlying action).

      Further, in the exercise of its discretion the court finds that a stay of RLI's rescission claim is also appropriate under these circumstances. The factual issues regarding concealment,

11

failure to disclose, and misrepresentation implicated in RLI's rescission claim do not overlap with the issues presented in the underlying state court action. However, they do overlap with RLI's declaratory judgment claim, to the extent that RLI argues that Cornerstone's same misrepresentations or concealment of material facts in the Application process that support RLI's rescission claim also establish a complete defense to a claim under the Policy and therefore warrant declaratory judgment in its favor. Given the partially-overlapping bases of the rescission and declaratory judgment claims, the court finds that the most efficient course of action is to make all coverage determinations at once, rather than embrace either party's proposed bifurcation model. *See Atain Specialty Ins. Co.*, 2020 WL 3640011, at *4 (staying the insurance coverage action in full where the rescission claim did not overlap with the underlying action but overlapped in part with the declaratory judgment claims, finding that "the most efficient course of action would be to make all determinations together").

Accordingly, the court will grant defendant's motion to stay these proceedings through resolution of the underlying action.

**B.      Defendant's Motion for Leave to File a Counterclaim**

Defendant Cornerstone also filed a concurrent motion seeking leave to assert counterclaims against RLI for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. (Doc. No. 21-1 at 1.) Cornerstone requests that if this court grants its motion to stay, it be permitted to file an amended pleading, and that the counterclaims brought therein be stayed along with RLI's claims. (*Id*. at 2.) As noted above, RLI filed a notice of non-opposition to this motion. (Doc. No. 28.) The court finds that defendant's motion was timely filed under the court's scheduling order (Doc. No. 12), and there is no apparent prejudice to plaintiff as plaintiff does not oppose the motion. Accordingly, defendant Cornerstone's motion for leave to file a counterclaim will be granted, and defendant will be ordered to file its counterclaim within fourteen days of the date of entry of this order.

/////

/////

/////

**CONCLUSION**

For the reasons explained above,

1. Defendant's motion for leave to file a counterclaim (Doc. No. 21) is granted;

2. Defendant shall file its counterclaim within fourteen (14) days of the date of entry of this order;

3. Defendant's motion to stay this action (Doc. No. 20) is granted and this action is hereby stayed pending resolution of related state court proceedings: *Mahrt v. Cornerstone et al.*, No. SCV-270601 (Sonoma County Superior Court);

4. The parties shall file a joint status report within 90 days from the date of entry of this order, and every 90 days thereafter, informing this court as to the status of the related state court proceedings; and

5. In addition, the parties shall file a notice informing this court that a final judgment has been entered in the related state court proceedings within fourteen (14) days of entry of that judgment by the state court.

IT IS SO ORDERED.

Dated:   **October 31, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

13